Steven E. Lipman (SL-9395)
Robert L. Jacobson (*pro hac vice*)
DARBY & DARBY P.C.
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Telephone:  212.527.7700
Facsimile:  212.527.7701
Email:  slipman@darbylaw.com
        rjacobson@darbylaw.com

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

THE ASSOCIATED PRESS,                      :
                                           :
                    *Plaintiff*,           :        No. 1:08-CV-000323 (PKC)
                                           :                 ECF CASE
          v.                               :
                                           :
ALL HEADLINE NEWS CORP., ET AL.,           :
                                           :
                    *Defendants*.          :
------------------------------------------------------------x


**DEFENDANTS' REPLY IN SUPPORT OF THEIR
RENEWED MOTION TO DISMISS**

(Substituted brief per Order of June 30, 2008)

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................................... 1

II.  ARGUMENT ............................................................................................................. 1

    A.   AP Cannot Obtain "Proprietary Rights" in Facts About the News............................. 1

    B.   Unfair Competition by "Misappropriation" (Count I) ................................................. 2

        1.   There is no general law of "misappropriation" ................................................. 2

        2.   This case is nothing like INS v. AP................................................................. 3

        3.   New York and Florida courts would not recognize a cause of action for "misappropriation" under these facts ................................................. 4

        4.   If there is a conflict, Florida law controls........................................................ 7

        5.   Any surviving claim of misappropriation is preempted ................................... 7

    C.   AP's Other Arguments............................................................................................. 9

        1.   Count III (the Digital Millennium Copyright Act)........................................... 9

        2.   Count IV (trademark infringement)................................................................. 9

        3.   Counts V and VI (unfair competition)............................................................. 10

III. CONCLUSION ......................................................................................................... 11

## I.    INTRODUCTION

AP concedes the "well settled rule" that federal copyright law "does not prevent facts from being copied." Opp. Br. at 8 n.3. This is the specific holding of the unanimous Supreme Court opinion in Feist Publications. Aware of this limitation, AP instead seeks to make an end-run around federal copyright law. It resorts to the elusive common-law doctrine of "misappropriation" specifically to *prevent facts from being copied*.

This case must rise or fall under AP's theory of copyright infringement. The gravamen of the Amended Complaint is that AHN writers "surf the web" and "copy breaking stories" after they have been posted on public websites like Yahoo.[1] Amended Complaint, ¶ 5; Opp. Br. at 8. These allegations of "copying" sound in copyright law. If AP can support this theory (which AHN vigorously contests), then it will have the full remedies permitted by Congress under the Copyright Act. If not, then it cannot recast the same allegations as "misappropriation" under state common law, or under its numerous other makeweight theories, in an attempt to obtain protection over uncopyrighted facts.

## II.    ARGUMENT

### A.    AP Cannot Obtain "Proprietary Rights" in Facts About the News

As it did ninety years ago in the INS v. AP opinion, AP is once again trying to use litigation as a vehicle to create new law and obtain broader protection than is permitted under copyright law.[2]

---

[1] AHN vigorously disputes these factual contentions. However, it assumes these as true, as it must, solely for purposes of its motion to dismiss under Federal Rule of Civil Procedure 12.

[2] Of note, the INS case was the culmination of AP's aggressive and decades-long legal strategy to obtain legal "property rights" in news. See Douglas G. Baird, U Chicago Law & Economics, Olin Working Paper No. 246, Property, Natural Monopoly, and the Uneasy Legacy of INS v. AP (June 2005) (available at http://ssrn.com/abstract=730024). See also Victoria Smith Ekstrand, News Piracy and the Hot News Doctrine, 16-25 (2005) (noting that in the decades leading up to INS, AP first asked Congress to create a statute to prohibit so-called "news piracy," and then asked various courts to accomplish the same result when those bills were rejected).

Indeed, the AP is now embarking on a similar strategy through this case and elsewhere. Within the past month, the AP has apparently sent threats to various third parties, such as bloggers, for doing nothing more than copying one or two paragraphs of AP content (which virtually anyone would consider a fair use under copyright law). The AP has also apparently recently begun a "licensing" program in which it demands extortionate royalties from anyone who copies merely *five words or more* from an AP story, regardless of fair use. The Court can take judicial notice of these apparent facts. See Exhibits A & B to this brief; see generally Cory Doctorow, Associated Press Expects You to Pay to License 5-Word Quotations, BoingBoing, June 17, 2008, http://boingboing.net/2008/06/17/associated-press-exp.html (last visited July 2, 2008).

AP candidly admits its ultimate goal of obtaining "proprietary rights" in publicly-reported facts. First Amended Complaint, ¶ 33. This it cannot do. As Justice Brandeis correctly foreshadowed in his dissent in <u>INS</u>, and the unanimous Supreme Court effectively agreed in <u>Feist</u>, those facts remain "free as the air to common use." <u>International News Service v. Associated Press</u>, 248 U.S. 215, 250 (1918) (Brandeis, J., dissenting).

Throughout its Amended Complaint and its brief, AP continues to argue that it has expended "massive, continuing investments" in its collection and reporting of facts, while AHN has supposedly acted "parasitically" by reaping the benefits of AP's hard work. Opp. Br. at 8. The plaintiff in <u>Feist</u> made the same arguments, and the Supreme Court rejected them. This alleges nothing more than "sweat of the brow." Under <u>Feist</u>, parties are free and encouraged to copy others, so long as they do not infringe. This serves a greater good by giving consumers additional choices in the marketplace.

AP offers no explanation for why it should be entitled to *additional protections* — above and beyond federal copyright law — to prevent alleged copying. Copyright law provides a well-defined set of boundaries that distinguishes between copyright infringement and permissible copying (such as permissible copying of unprotected facts, and permissible copying as a fair use). If such copying is *expressly permitted* under federal copyright law, then there is no basis for allowing additional rights under ill-defined theories of "misappropriation."

### B.    UNFAIR COMPETITION BY "MISAPPROPRIATION" (COUNT I)

#### 1.    There is no general law of "misappropriation"

AP argues that the Supreme Court "has never questioned, much less repudiated, the holding of <u>INS</u>." Opp. Br. at 2. This assertion is meritless. The Supreme Court repudiated the holding of <u>INS</u> in <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64 (1938). <u>See id.</u> at 78 ("There is no federal general common law."). <u>INS</u> is no longer good law. "Although the United States Supreme Court has occasionally cited the <u>INS</u> decision, it has never reaffirmed the misappropriation doctrine." <u>Restatement (Third) of Unfair Competition</u> § 38, Reporter Notes, Cmt. C (1995).

AP also argues that the <u>Feist</u> court did not expressly deal with misappropriation. This is true to a point. In <u>Feist</u>, the Supreme Court cited the <u>INS</u> opinion favorably for the proposition that *facts*

*about the news cannot be copyrighted.* Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 353-54 (1991). The plaintiff in Feist had the good sense not to assert a parallel theory of "misappropriation," so the Court simply demurred that the other holding of INS was "not relevant here." Id. at 354 n.1. However, the Feist court expressly held that facts cannot be protected under federal copyright law and the Constitution. It is impossible to read the opinion as suggesting that those facts can instead be freely protected *under state common law*.

AP further argues, without support, that "every other state to consider the question" has endorsed the misappropriation doctrine. Opp. Br. at 1. This argument is likewise erroneous and a misstatement of law. As AHN noted in its opening brief, many courts, like those of Massachusetts and Florida, have expressly declined to follow INS. See Glazer v. Hoffman, 16 So. 2d 53, 55-56 (Fla. 1943); Triangle Publications, Inc. v. New England Newspaper Pub. Co., 46 F. Supp. 198, 203 (D. Mass. 1942).

The American Law Institute further states, in Section 38 of the Restatement (Third) of Unfair Competition, that the misappropriation doctrine should no longer be viewed as good law. That section then cites page after page of opinions that have rejected or limited this doctrine. A copy is attached as Exhibit C for convenience. AP ignores the Triangle Publications opinion and offers no response to the Restatement in its brief.

At best, the misappropriation doctrine survives as a vestige under certain state common laws. New York courts have recognized an elastic and ill-defined tort of "misappropriation" that prohibits "commercial immorality." The modern approach is stated in the Restatement, namely to limit this doctrine as vague, unnecessary, and contrary to well-defined federal copyright law.

### 2.    This case is nothing like INS v. AP

AP points out superficial similarities between this case and the INS case, while ignoring important differences. The INS opinion did not recognize a general tort of "misappropriation" whenever "hot news" is copied. Rather, the Supreme Court held that where the defendant was found guilty of *obtaining premature access to the news* by bribing AP employees, intercepting AP

telegraph communications, and copying early-edition news posted on bulletin boards, all of those acts together could properly be enjoined.[3]  Those acts certainly sound like "unfair competition."

AP does not allege any similar facts here, such as anything "unfair" (apart from copying). Rather, the Amended Complaint merely alleges that AHN "browsed the web" and copied news articles after they were generally released to the public.  AP complains that AHN is copying on a large scale, but this still just alleges copying.  AP is seeking to extend the INS case far beyond its holding and create an entirely new theory of common law protection for facts.[4]

### 3.     New York and Florida courts would not recognize a cause of action for "misappropriation" under these facts

AP fails to identify any relevant authority suggesting that either New York or Florida would recognize a cause of action for "misappropriation" here, where the Amended Complaint merely alleges copying of publicly-reported facts.  Consequently, there is no need to reach the more difficult question of whether such a cause of action is preempted.  This Court must predict how the highest state courts of Florida and New York would decide this issue under these alleged facts.  Erie, 304 U.S. at 78.  Other federal opinions are instructive, but not controlling.

AP tacitly concedes that no Florida state court has ever recognized such a cause of action.  In Glazer v. Hoffman, 16 So. 2d 53, 55-56 (Fla. 1943), the Florida Supreme Court expressly declined to recognize a general theory of misappropriation under INS.  Accord Herald Publishing Co. v. Florida Antennavision, Inc., 173 So. 2d 469, 474-75 (Fla. Dist. Ct. App. 1965).  No other Florida state

---

[3] AP correctly notes that in some instances, the news articles were copied from publicly-available bulletin boards on the East Coast that contained early editions of the news.  However, the opinion went on to emphasize that because of the technology at the time, this allowed INS to copy and republish those news articles in early editions on the West Coast *before* AP could do so in those markets (because of the time difference), which added insult to injury by suggesting that AP was copying INS.  Those concerns are not present here.  In any event, the Court merely considered this as one factor that justified broad injunctive relief to prevent further misconduct.

[4] Moreover, the 5-3 majority opinion in INS was motivated by two factors:  (1) both parties there agreed that the news articles at issue *were not copyrighted* under the Copyright Act of 1909 (it was effectively impossible to copyright newspaper articles because those copyrights had to be registered first); and (2) the Copyright Act of 1909 did not preempt other causes of action.  The Supreme Court was free to fill in the gaps through common law.

Those issues have no remaining validity today under the Copyright Act of 1976.  Unlike in INS, both parties here agree that AP is entitled to copyright protection, to the extent it can support that theory.  There is no need to reach for additional common-law theories.

opinions have addressed the issue. Several recent federal district court opinions have likewise expressly declined to import a general theory of "misappropriation" into Florida law. See North Atlantic Marine, Ltd. v. Sealine Int'l, Ltd., 2007 U.S. Dist. LEXIS 23046, *34-38 (S.D. Fla. Mar. 29, 2007); Pena-Rivera v. Editorial Am., 1997 U.S. Dist. LEXIS 11795 (S.D. Fla. May 5, 1997). AP does not even respond to these two opinions in its brief.

AP also fails to address Section 38 of the Restatement (Third) of Unfair Competition. The Florida courts commonly follow the Restatement approach to unfair competition, and they would likely do the same here. See, e.g., Tyne v. Time Warner Entm't Co., L.P., 901 So. 2d 802, 807-08 (Fla. 2005) (following Section 47 of the Restatement).

AP instead relies almost exclusively on Morris Communications Corp. v. PGA Tour, Inc., 117 F. Supp. 2d 1322 (M.D. Fla. 2000). However, this opinion does not purport to recognize a cause of action for misappropriation under Florida law. Rather, this was an action under Section 2 of the Sherman Antitrust Act. The court held that golf scores at a private tournament on private property could be protected as confidential until they were later released to the public, and that such restrictions on attendees did not constitute an antitrust violation. The Court merely cited the INS doctrine as an analogy under the Sherman Act as support for the defendant's valid business justification to control confidential information. Id. at 1326-31.[5]

Likewise, AP fails to identify any New York opinions that have recognized misappropriation claims under similar facts. In Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d 556, 161 N.E.2d 197

---

[5] In a subsequent opinion, the court emphasized the narrowness of its holding. It specifically found a " 'hot news' claim inapplicable." Morris Communications Corp. v. PGA Tour, Inc., 235 F. Supp. 2d 1269, 1279 n.15 (M.D. Fla. 2002) ("Morris II"), aff'd, 364 F.3d 1288 (11th Cir. 2004). It reiterated that its holding was limited to confidential information, and did not apply to facts "released into the public domain through radio or television broadcasts or through a web site." Id. at 1271 (emphasis added). On appeal, the Eleventh Circuit further reiterated that this was an antitrust case, not a copyright or misappropriation case, and that the INS opinion was "fundamentally distinguishable." 364 F.3d at 1292-93, 1297. AP misstates the holding of the first opinion and fails to discuss this subsequent history.

AP also relies on opinions like CBS, Inc. v. Garrod, 622 F. Supp. 532, 535-36 (M.D. Fla. 1985), for the general proposition that unfair competition in Florida is not limited to cases of palming off. Garrod cites to B. H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254 (5th Cir. 1971), for this proposition. However, the Fifth Circuit actually held just the opposite: "The gist of unfair competition in Florida is 'palming off.' " Id. at 1262.

(1959), for example, the New York Court of Appeals merely held that a bait-and-switch strategy of advertising one vacuum cleaner while intending to sell another brand constituted unfair competition under New York law. This quaint and uncontroversial opinion quoted <u>INS</u>, but it did not even involve a claim for misappropriation. <u>Id.</u> at 567-68.

AP argues that "time-sensitive" information can be protected against "misappropriation," but such cases generally involve *confidential information* that was not yet released to the public. <u>See, e.g.</u>, <u>Lynch, Jones & Ryan, Inc. v. Standard & Poor's</u>, 1998 N.Y. Misc. LEXIS 334 (N.Y. Sup. Ct., N.Y. County, June 11, 1998) (finding "misappropriation" for premature distribution of financial data where the paid subscribers were contractually obligated to keep that time-sensitive information confidential for a 35-minute embargo period before public release). Such information is protected because the information "stands like a trade secret" in a confidential relationship. <u>Morris II</u>, 235 F. Supp. 2d at 1218 (quoting <u>Board of Trade v. Christie Grain & Stock Company</u>, 198 U.S. 236, 250 (1905)).[6]

Finally, AP appears to contend that <u>National Basketball Association v. Motorola, Inc.</u>, 105 F.3d 841 (2d Cir. 1997) "redefined" the elements of a cause of action for misappropriation under New York law. AP is mixing apples and oranges. The five-factor analysis in <u>NBA</u> addresses whether such a claim for misappropriation *is preempted* under federal law (assuming it is sufficiently pleaded), *not the elements of the underlying state claim*. As the Second Circuit later confirmed, misappropriation under New York law continues to require "fraud or deception, or an abuse of a fiduciary or confidential relationship," none of which is present here. <u>Telecom Int'l Am., Ltd. v. AT&T Corp.</u>, 280 F.3d 175, 198 (2d Cir. 2001).

---

[6] In one forty-year-old exception, the Appellate Division found "misappropriation" for copying of non-confidential information in the public domain under a theory that "[t]o make a commercial use of the result of the labor is ... to reap where one has not sown." <u>Bond Buyer v. Dealers Digest Publishing Co.</u>, 25 A.D.2d 158, 160, 267 N.Y.S.2d 944 (1st Dep't 1966). However, this is a straightforward "sweat of the brow" case that cannot be reconciled with <u>Feist</u>. This opinion is not controlling, and the New York Court of Appeals would not endorse such logic today. <u>See, e.g.</u>, <u>Editorial Photocolor Archives, Inc. v. Granger Collection</u>, 61 N.Y.2d 517, 532, 463 N.E.2d 365 (1984) (holding that state unfair competition claims were preempted, emphasizing that plaintiffs cannot "by miscasting their causes of action, secure the equivalent of copyright protection under guise of State law").

### 4.    If there is a conflict, Florida law controls

All of the alleged tortious conduct occurred in Florida.  AHN and the individual defendants are citizens of Florida, the individual defendants live and work at AHN's office in Florida, the accused articles are coordinated from offices in Florida, the writers are hired and paid from Florida, and the articles are published from Internet servers that are physically located in Florida.  The accused articles are distributed worldwide, and are not specifically directed at New York.  Florida has the greatest "government interest" in the litigation and regulating its citizens.

AP does not identify any cases that apply choice-of-law questions for unfair competition or misappropriation, but instead relies on cases for claims "based on fraud."  Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001).  Fraud is an intentional tort, which requires causing intentional harm to the plaintiff *as an element of the tort*.  In cases based on fraud, such a tort physically occurs in New York (where the harm is directed and received), and that state has a strong interest in preventing intentional harm to its citizens.  See Sack v. Low, 478 F.2d 360, 366 (2d Cir. 1973) ("when a person sustains loss by fraud, the place of wrong is where the loss is sustained").

In contrast, misappropriation is not an intentional tort like fraud.  AP does not allege in its Amended Complaint (nor could it) that AHN *intentionally directed harm* at AP in New York, but simply that AP suffers economic loss as an outcome of AHN's accused conduct.  Moreover, AP does not meaningfully distinguish either Torah Soft, Ltd. v. Drosnin, 224 F. Supp. 2d 704, 719 (S.D.N.Y. 2002) or Computer Assocs. Int'l v. Altai, Inc., 982 F.2d 693, 698, 718 (2d Cir. 1992).  Both opinions specifically held that claims of unfair competition were governed by the law where the alleged tortious conduct occurred (which here is Florida), not where the purported harm was felt.  AP purports to distinguish Computer Associates on the basis that it applied New Jersey law, but New York and New Jersey both apply the same "government interest" analysis.

### 5.    Any surviving claim of misappropriation is preempted

AP relies almost exclusively on the NBA opinion, but misreads the holding.  That case held that the particular claim before it, for "misappropriation" based on copying of sports scores, *was preempted* under the Copyright Act.  The NBA opinion crafted a five-factor test to help resolve

issues of preemption, and the test may be quite useful in certain cases.  However, the Second Circuit never suggested that this test was complete and exclusive, and it could not be expected to opine about each and every hypothetical future case based on facts not before it.

As the court later emphasized in Briarpatch, the copyright preemption analysis requires a close look at the nature of the underlying theory, including "what the plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004).  AHN does not disagree with the NBA opinion that a true claim of "hot news" misappropriation under the facts of INS would likely survive preemption (such as one that included bona fide acts of *unfair competition* through bribery or other specific bad acts); but that is simply not alleged here.  The fact that AP alleges copying of news articles, or even copying of news on a massive scale, does not make the claim *qualitatively different* than any other theory of copyright infringement.  See 1 David Nimmer, Nimmer on Copyright, § 1.01[B][1][f][iv] (2006)(noting that typical "commercial immorality" misappropriation claims are preempted, but claims where "defendant gained access to plaintiff's materials through abuse of a fiduciary or confidential relationship" may survive preemption).

The NBA opinion also failed to consider the intersection of Feist and INS with respect to preemption.  It had no need to do so in that case, since the underlying legal claim there was plainly preempted.  However, Feist is controlling authority, and the present case has strong parallels to Feist. Would the Supreme Court today allow a cause of action for "misappropriation" under state common law that alleges nothing more than copying of publicly-available facts under a sweat-of-the-brow theory?  Can this even be argued in light of Feist?

As this Court recently held in ABC, Inc. v. Flying J, Inc., 2007 U.S. Dist. LEXIS 13252, *25-34  (S.D.N.Y. Feb. 22, 2007), a claim for "misappropriation" that ultimately alleges nothing more than copyright infringement on a large scale does not *differ in kind* from one for copyright infringement.  Ad hominem attacks that call the business "parasitic" (as AP does here and the plaintiff did there) do not change the analysis.  See also Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737, 754-56 (D. Md. 2003); Scholastic, Inc. v. Stouffer, 124 F. Supp. 2d 836, 847

(S.D.N.Y. 2000) (holding that an INS-style misappropriation claim only survives preemption when "the underlying work is not copyrightable"). Here, the theory that AHN copied news articles from websites falls within the "general scope" of copyright. Any attempt to prevent such copying under a parallel theory of "misappropriation" must be preempted.[7]

### C.    AP'S OTHER ARGUMENTS

The remaining arguments in AP's opposition brief merit little response.

#### 1.    Count III (the Digital Millennium Copyright Act)

AP will argue whichever position suits its immediate needs. In McClatchey v. AP, 2007 U.S. Dist. LEXIS 17768 (W.D. Pa. Mar. 9, 2007), where it was a defendant, AP specifically advocated for the same position that AHN is arguing today. The thinly-reasoned McClatchy opinion should be rejected, and the better analysis in Textile Secrets Int'l, Inc. v. Ya-Ya Brand, Inc., 524 F. Supp. 2d 1184 (C.D. Cal. 2007) and IQ Group, Ltd. v. Wiesner Publishing LLC, 409 F. Supp. 2d 587 (D.N.J. 2006) should be followed. This is particularly true where, as here, the Amended Complaint merely alleges that AHN wrote its own news articles based on information taken from AP articles (rather than making literal copies). Moreover, as IQ Group noted, the DMCA does not create a general cause of action for copyright infringement of everything "digital" online.

#### 2.    Count IV (trademark infringement)

There is no absolute bar that prevents one competitor from referring to another, and a passing mention to another company cannot create a federal case. As Justice Holmes aptly stated in Prestonettes, Inc. v. Coty, 264 U.S. 359, 367 (1924):

---

[7] AP's reliance on H.R. 94-1476 is misplaced. This House Report was commenting on an *earlier draft* of Section 301(a) that expressly included an exception for "misappropriation" by name. That language was later deleted from the final bill. See Restatement (Third) of Unfair Competition, § 38 at Reporter Notes, cmt. d ("The reference to misappropriation was deleted [from Section 301(a)] prior to enactment."). This report is therefore doubtful authority concerning Congressional intent about whether "misappropriation" should be preempted under Section 301(a). Moreover, the remaining legislative history concerning Section 301(a) provides little guidance. See Nimmer on Copyright, § 1.01[F][1][f][i] at 1-34 to 1-36 (noting abundant "confusion" during House debate where various congressmen took "diametrically opposed" positions about whether misappropriation claims are preempted).

> [A trademark] does not confer a right to prohibit the use of the word or words.  It is not a copyright. ... When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth.  It is not taboo.

Accord Dow Jones & Co. v. Int'l Sec. Exch., Inc., 451 F.3d 295, 307-08 (2d Cir. 2006).

The Court respectfully need not set aside common sense.  Although AP alleges that AHN has engaged in massive trademark infringement, only one of the six articles attached to the Amended Complaint, namely Exhibit 22, contains any reference to AP.  That article does so only within the context of a passing and perfectly accurate attribution of information.  The same article also refers to AHN by name no less than eight times, including the prominent "AHN" logo at the top and the byline from "Ayinde O. Chase - AHN Staff."  The Court can decide for itself whether any reasonable consumer could believe that this article was necessarily *authored or approved* by AP.  This claim is ripe for dismissal.  Dow Jones, 451 F.3d at 307-08; Merck & Co. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 412-15 (S.D.N.Y. 2006).

### 3.    Counts V and VI (unfair competition)

AP cannot become the arbiter of what constitutes a proper "news service" and enshrine that definition into law by judicial decree.  AHN unquestionably offers a "service" that provides "news." That service meets and exceeds the needs of its customers, or they would go elsewhere.

In First Health Group Corp. v. BCE Emergis Corp., 269 F.3d 800 (7th Cir. 2001), the plaintiff made a similar attempt to redefine the meaning of "preferred provider organization" under the Lanham Act to the exclusion of its competitor.  The court rejected this as seeking "nothing less than an order establishing property rights in the language. ... First Health should have turned to an advertising agency, not to a court, in search of a response to its business rivals."  Id. at 804-05.

Likewise, AP cannot use trademark and unfair competition law to prevent AHN from "carry[ing] AP news without attribution."  Opp. Br. at 22.  This is another attempt to prevent facts from being copied, which sounds in copyright law.  As the Supreme Court recognized in Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 36 (2003), Section 43(a) of the Lanham Act does not create a cause of action "for, in effect, plagiarism."

AP contends that the <u>Dastar</u> opinion only involved "reverse passing off" under Section 43(a)(1)(B) of the Lanham Act, while AP is now relying on regular passing off under Section 43(a)(1)(A).  As this Court recognized in <u>Thomas Publishing Co. v. Tech. Evaluation Ctrs., Inc.,</u> 2007 U.S. Dist. LEXIS 55086, *5-10 (S.D.N.Y. July 27, 2007), this is a distinction without a difference.  AP fails to respond to <u>Thomas Publishing</u> in its brief or identify any cases that have allowed such a theory after <u>Dastar</u>.[8]

## III.    CONCLUSION

For the foregoing reasons and those stated in AHN's opening brief, Defendants respectfully submit that the Court should dismiss Counts I, III, IV, V, and VI.

Dated:          July 2, 2008
                New York, New York

                                    Respectfully submitted,


                            By:     s/ Steven E. Lipman
                                    Steven E. Lipman (SL-9395)
                                    Robert L. Jacobson (*pro hac vice*)
                                    DARBY & DARBY P.C.
                                    7 World Trade Center
                                    250 Greenwich Street
                                    New York, NY  10007
                                    Telephone: 212.527.7700
                                    Facsimile:  212.527.7701
                                    E-mail: slipman@darbylaw.com
                                            rjacobson@darbylaw.com

                                    *Attorneys for Defendants*

---

[8] AP's claim for breach of contract is purely makeweight.  AP is seeking approximately $4,000 in damages.  AHN concedes for purposes of its underlying motion to dismiss that AP can aggregate its claims for purposes of diversity jurisdiction, and therefore withdraws its argument concerning Count VII to simplify matters for the Court.

AHN notes, however, that through this claim, AP is seeking to enforce a contract from several years ago between *two entirely different parties*, namely a subsidiary of AP and a predecessor of AHN.  AP alleges, on information and belief, that it has some basis for doing so.  AHN can only assume that AP has some Rule 11 basis for these allegations.  While such allegations may pass the minimal requirements of Rule 12, AHN will bring an appropriate motion for summary judgment on this issue at a later time.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing:

**DEFENDANTS' REPLY IN SUPPORT OF**
**THEIR RENEWED MOTION TO DISMISS**
(Substituted brief per Order of June 30, 2008)

was submitted to the Court's CM/ECF system on July 2, 2008 for service by the Court's

Electronic Transmission Facilities upon the following:

Andrew Lawrence Deutsch
Christine M. Jaskiewicz
DLA Piper US LLP (NY)
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500
Fax: (212) 335-4501
Email:    andrew.deutsch@dlapiper.com
              christine.jaskiewicz@dlapiper.com

*Counsel for Plaintiff*
*The Associated Press*

s/ Steven E. Lipman
By:  Steven E. Lipman

# Exhibit A

Content Services  Powered by iCopyright

 Associated Press

Article: AP NewsAlert
Copyright: 2008 Associated Press
Publication: Associated Press



 **Excerpt for Web Use**
License parts of this article for republishing on your website or intranet. Pricing based on the number of words excerpted.

Excerpts are priced by the word.

| words | Fees |
|---|---|
| 5-25 | $ 12.50 |
| 26-50 | $ 17.50 |
| 51-100 | $ 25.00 |
| 101-250 | $ 50.00 |
| 251 and up | $ 100.00 |

**Use Educational Pricing**
**Use Non-Profit Pricing**

*Cut and paste the text fragment you want to excerpt into this box.*

**Excerpt:**

2000   characters left

*Please enter the web address where this excerpt will be published:*

**URL:** http://

**Terms of Use:** ☐ I agree to the publisher's terms of use.

◀ BACK          CANCEL ✖          NEXT ▶

Please honor copyright! Piracy hurts creators, devalues their works, and puts you and your employer at risk. Learn more.

Copyright 1998-2008 iCopyright, Inc. All rights reserved, patent-pending.
Terms of Use | Privacy Policy | My Account | Clip&Copy®

# Exhibit B



HOME          YOUR SERVICES          NEWS & RESOURCES          ABOUT US          CONTACT

Industry Articles on Copyright   ::   **iCopyright in the News**   ::   Free News & Clipping Service

**« Back to iCopyright in the News :: 2008**

FOR IMMEDIATE RELEASE

### iCopyright Named Licensing Agent for Reuse of Associated Press Content Published Online

**Pact adds new article tools for online users, enhancing copyright protection and licensing of AP stories**

SEATTLE, Washington, April 14, 2008 -- iCopyright has entered into a digital content copyright protection and permission agreement with The Associated Press, providing online users of AP content with a Web-based method to license and share AP stories and photos for a variety of commercial and educational uses.

AP will display iCopyright links at the top and bottom of every AP-hosted story so users can easily use, share and license content instantly. AP will encourage subscribers to add the iCopyright tags to the AP stories they publish on their own websites. Publishers that deploy iCopyright tags earn revenue from reuse licenses while preserving copyrights and brand awareness.

"This online content reuse arrangement opens up a new source of revenue from rights, permissions and reprints of AP content while enhancing copyright protection and licensing," said AP Deputy Director/Business Development Bruce Glover. "iCopyright makes it easier to monitor copyright compliance and to identify pirated and misappropriated stories."

Mike O'Donnell, Founder and CEO of iCopyright, said, "We could not be more pleased and honored to be named the exclusive licensing agent for AP's hosted content. Online users will be able to click the Email | Print | Post | Save | License links at the top of AP stories to easily use and share the stories, while respecting AP's copyrights. By encouraging all of its members to also add the iCopyright tags, AP is helping to set a standard that the entire digital content industry can emulate."

"We are very pleased to be one of the first news organizations already using iCopyright services to leverage this exciting development ", said Toby Leith, Content Licensing Manager for the Boston Globe. "For years, our customers have sought to create reprints based on AP content but with the Globe's logos and masthead for local use. Now, through iCopyright, they have a variety of service options to do just that!"

Jack Lail, Managing Editor/Multimedia for The Knoxville News Sentinel, who is already using the iCopyright links on Knoxnews stories and AP stories, said, "iCopyright is a hassle-free way of handling reprints. The customer gets instantaneous fulfillment. Everybody wins!"

iCopyright, the intelligent copyright service for online content, solves a problem that is common in online media: Allowing users to copy or redistribute desirable articles quickly and easily while protecting and tracking a publisher's proprietary content on the World Wide Web. Without erecting barriers to content, iCopyright makes it easy for consumers of content to be respectful of copyrights when they wish to share content with others. Reuse options include formatted group e-mail distributions, instant desktop copies, instant web reprints, quality quick prints delivered overnight, and a variety of high-end custom reprints and e-prints. These services are available in free advertising-supported formats as well as modestly priced versions that users may purchase by credit card online.

**Number of articles licensed through iCopyright this year:**

Today's 10
**Most Popular STORIES**

1. Study finds long benefit in illegal mushroom drug
2. Woman crashes into store then tries to buy beer
3. Beware Of Flaws In Bases' Handle Areas
4. Indexes Bounce Back In Higher Volume, Close Mixed; GM Sales Brighten Market

To publish this Most Popular list on your website, **click here »**

**Click here** to chat with an iCopyright representative.





*Example of iCopyright licensing services for AP articles, co-branded with the site that published the story.*

About iCopyright®

iCopyright (www.icopyright.com) is the intelligent copyright system for digital content. Founded in 1998, the Codie-Award winning service currently handles thousands of online permissions every day. iCopyright has generated millions of dollars in new licensing revenue for online publishers. iCopyright also markets Clip&Copy®, the media monitoring service that pushes iCopyright-tagged content to subscribers daily (www.clipandcopy.com). In 2007, iCopyright was named one of the Top 100 Companies that Matter Most in the Digital Content Industry by EContent magazine.

Media Inquiries to iCopyright: Mike O'Donnell, CEO, iCopyright; 206-484-8561; mike@iCopyright.com.

AP Subscriber Inquiries to iCopyright: Andrew Elston, Director of Publisher Services, 206-839-8540; **andrew@icopyright.com**, or **click here** for more information.

*End*

―――――

**« Back to iCopyright in the News :: 2008**



iCopyright Recognized in EContent
Top 100 **Companies that Matter**
**Most in the Digital Content Industry**.

Home | Your Services | News & Resources | About Us | Contact | Terms of Use | Privacy          Copyright 2008, iCopyright, Inc. All rights reserved. 206.484.8561

# Exhibit C

LEXSTAT RESTAT UNFAIR COMP THIRD 38

Restatement of the Law, Third, Unfair Competition
Copyright (c) 1995, The American Law Institute

Case Citations

Rules and Principles

Chapter 4 - Appropriation of Trade Values

Topic 2 - Trade Secrets

Restat 3d of Unfair Competition, § 38

§ 38 Appropriation of Trade Values

One who causes harm to the commercial relations of another by appropriating the other's intangible trade values is subject to liability to the other for such harm only if:

(a) the actor is subject to liability for an appropriation of the other's trade secret under the rules stated in §§ 39-45; or

(b) the actor is subject to liability for an appropriation of the commercial value of the other's identity under the rules stated in §§ 46-49; or

(c) the appropriation is actionable by the other under federal or state statutes or international agreements, or is actionable as a breach of contract, or as an infringement of common law copyright as preserved under federal copyright law.

## COMMENTS & ILLUSTRATIONS:

Comment:

a. Scope and relationship to other rules. Chapter One of this Restatement recognizes the freedom to engage in business and to compete with others for the patronage of prospective customers. The law of unfair competition imposes liability only in connection with particular methods of competition that undermine rather than advance the competitive process. See § 1. Chapter Two of this Restatement states rules governing liability for deceptive practices that deprive consumers of the accurate information necessary for the efficient operation of a competitive market. Chapter Three states rules prohibiting the infringement of trademarks and other trade designations in order to prevent consumer confusion and encourage investment in good will. This Chapter states the rules relating to liability for the appropriation of information and other intangible trade values. This Section states the general rule governing the protection of such trade values. Sections 39-45 state the rules applicable to the protection of trade secrets. Sections 46-49 state the rules protecting the commercial value of a person's identity.

The primary sources of protection for intangible trade values are the federal patent and copyright laws. These statutory systems offer extensive protection to eligible subject matter and also significantly limit the protection of intangible trade values under state statutory and common law. See Comment e.

The rules stated in this Chapter deal with rights in intangible trade values. Conduct that interferes with other protected interests may subject the actor to liability under other rules of tort law. An appropriation of tangible assets, for

example, may be actionable under the law of conversion, and an appropriation of a person's identity may infringe upon noncommercial interests protected under the law of privacy. See § 46, Comment b. Similarly, conduct that induces a breach of contract may be actionable under the general principles of tort law prohibiting interference with contractual relationships. Interference with mere prospective economic relationships, however, does not ordinarily subject a competitor to liability unless the interference is accomplished through "wrongful means." See *Restatement, Second, Torts § 768*. The rules stated in this Chapter determine whether the appropriation of an intangible trade value is a "wrongful means" of competition for purposes of that rule. Intangible trade values may also be the subject of contractual obligations, and the traditional remedies for breach of contract supplement the protection afforded under this Chapter. However, agreements that unreasonably restrain trade are not enforceable, and the rules stated in this Chapter can be helpful in determining whether a particular restraint is reasonable. See § 41, Comment d.

b. Misappropriation. Protection against the misappropriation of intangible trade values insures an incentive to invest in the creation of intangible assets and prevents the potential unjust enrichment that may result from the appropriation of an investment made by another. However, the recognition of exclusive rights in intangible trade values can impede access to valuable information and restrain competition. Unlike appropriations of physical assets, the appropriation of information or other intangible asset does not ordinarily deprive the originator of simultaneous use. The recognition of exclusive rights may thus deny to the public the full benefits of valuable ideas and innovations by limiting their distribution and exploitation. In addition, the principle of unjust enrichment does not demand restitution of every gain derived from the efforts of others. A small shop, for example, may freely benefit from the customers attracted by a nearby department store, a local manufacturer may benefit from increased demand attributable to the promotional efforts of a national manufacturer of similar goods, and a newspaper may benefit from reporting on the activities of local athletic teams. Similarly, the law has long recognized the right of a competitor to copy the successful products and business methods of others absent protection under patent, copyright, or trademark law.

Achieving a proper balance between protection and access is often a complicated and difficult undertaking. Because of the complexity and indeterminacy of the competing interests, rights in intangible trade values such as ideas, innovations, and information have been created primarily through legislation. The patent and copyright statutes illustrate the intricacy required to harmonize the competing public and private interests implicated in the recognition of rights in intangible trade values. Both statutes contain elaborate mechanisms intended to balance the interests in protection and access. Protection under the patent act, for example, is limited to innovations that are new, useful, and non-obvious to persons having ordinary skill in the art. The copyright act grants rights in works of authorship subject to a complex system of exemptions and limitations. Both statutes grant rights only for a limited term, after which the discovery or writing enters the public domain and may be freely appropriated by others.

The common law of unfair competition has generally recognized rights against the appropriation of intangible trade values only when the recognition of such rights is supported by other interests that justify protection, and then only when the scope of the resulting rights can be clearly defined. The protection of trade secrets, for example, reflects the established interests in preserving confidential relationships and promoting physical security. See §§ 39-45. Protection against an appropriation of the commercial value of a person's identity implicates interests in privacy, reputation, and personal autonomy. See §§ 46-49. In the absence of such additional interests, the common law has resisted the recognition of general rights against the appropriation of information and other intangible trade values.

In 1918, the United States Supreme Court in *International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918),* recognized a common law tort of "misappropriation" that afforded protection against the appropriation by a competitor of commercially valuable information otherwise in the public domain. Although the decision has been frequently cited, it has been sparingly applied. Notwithstanding its longevity, the decision has had little enduring effect. See Comment c. In many cases it has been invoked when narrower rules of unfair competition would have achieved the same result. In most of the areas in which it has been expansively applied, its application has now been supplanted by legislation.

The rule stated in this Section limits common law tort liability for appropriations of intangible trade values to cases

Restatement of the Law, Third, Unfair Competition, § 38

involving an appropriation of trade secrets, an appropriation of the commercial value of another's identity, or an appropriation of a work of authorship that is not fixed in a tangible medium of expression and thus protectable under common law copyright. See Comment d. Although courts have occasionally invoked the INS decision on an ad hoc basis to grant relief against other commercial appropriations, they have not articulated coherent principles for its application. It is clear that no general rule of law prohibits the appropriation of a competitor's ideas, innovations, or other intangible assets once they become publicly known. In addition, the federal patent and copyright statutes now preempt a considerable portion of the domain in which the common law tort might otherwise apply. See Comment e. The better approach, and the one most likely to achieve an appropriate balance between the competing interests, does not recognize a residual common law tort of misappropriation.

c. *International News Service v. Associated Press.* In *International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918),* the United States Supreme Court recognized a cause of action under federal common law for the misappropriation of a competitor's intangible trade values. The International News Service had copied information from Associated Press news dispatches published in eastern newspapers and transmitted news stories based on the information to INS-affiliated newspapers on the west coast for publication in competition with western members of the Associated Press. Although acknowledging the public's right to copy the uncopyrighted news reports, the Supreme Court held that the appropriation of news by a competitor for use in direct competition with the originator was actionable as unfair competition:

In doing this defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself, and a court of equity ought not to hesitate long in characterizing it as unfair competition in business.

*248 U.S. at 239-40, 39 S.Ct. at 72-73, 63 L.Ed. at 221.*

Although the decision appears to rest on a rationale of unjust enrichment potentially applicable to a wide range of competitive conduct, subsequent decisions have recognized that broad application of the unjust enrichment rationale in a competitive marketplace would unreasonably restrain competition and undermine the public interest in access to valuable information. The facts of the INS decision are unusual and may serve, in part, to limit its rationale. The originator of valuable information or other intangible assets normally has an opportunity to exploit the advantage of a lead time in the market. This can provide the originator with an opportunity to recover the costs of development and in many cases is sufficient to encourage continued investment. However, the appropriation in INS deprived Associated Press of any lead-time advantage, at least on the West Coast. Associated Press thus faced a direct threat to its primary market by a competitor who had incurred none of the development costs associated with collecting the news. Such circumstances present the most compelling case for protection against appropriation, although even on these facts Justice Brandeis argued persuasively in dissent that the proper balance between protection and access could be drawn only through legislation.

The limited extent to which the INS rationale has been incorporated into the common law of the states indicates that the decision is properly viewed as a response to unusual circumstances rather than as a statement of generally applicable principles of common law. Many subsequent decisions have expressly limited the INS case to its facts. In addition, in many of the decisions that invoke the misappropriation doctrine, other principles of unfair competition law are more directly applicable. For example, some courts have invoked the misappropriation doctrine to impose liability in trademark and trade dress cases notwithstanding proof of a likelihood of confusion sufficient to establish liability

under traditional principles of trademark law. Similarly, some cases have invoked the doctrine against appropriations involving breaches of confidence or other improper conduct actionable under the rules protecting trade secrets.

In most of the small number of cases in which the misappropriation doctrine has been determinative, the defendant's appropriation, like that in INS, resulted in direct competition in the plaintiff's primary market. Several cases, for example, invoke the doctrine to impose liability for an appropriation of news on facts more or less analogous to those in the INS case. Similarly, the misappropriation doctrine for a time played a significant role in restraining the unauthorized reproduction and sale of musical performances and sound recordings. Injunctions based on the misappropriation doctrine were granted against the sale of unauthorized recordings of radio broadcasts in competition with authorized recordings and against record and tape pirates selling unauthorized copies of popular sound recordings in competition with the originals. These decisions are now effectively superseded by the protection available under the 1976 Copyright Act to sound recordings and to broadcasts that are simultaneously recorded upon transmission. Even with respect to directly competitive appropriations, however, the implementation of enduring and appropriately circumscribed protection is generally best achieved through legislation rather than common law adjudication.

Appeals to the misappropriation doctrine are almost always rejected when the appropriation does not intrude upon the plaintiff's primary market. Only rarely have courts applied the doctrine to appropriations of intangible trade values for use in secondary or derivative markets. Absent proof of consumer confusion or a violation of other recognized principles of unfair competition law, such results go beyond even the broad rationale of the INS case.

d. Common law copyright. Prior to January 1, 1978, the effective date of the 1976 Copyright Act, the doctrine of common law copyright played an important role in preventing the appropriation of works of authorship. Common law copyright protected an author's proprietary and privacy interests in unpublished works by affording a right of first publication, thus precluding exploitation of the work by others prior to its publication by the author. After publication, protection against appropriation was governed by federal statutory copyright. However, under the 1976 Copyright Act, federal copyright protection subsists from the creation of a work, *17 U.S.C.A. § 302,* defined as the first fixation of the work in any tangible medium of expression. Id. § 101. Both published and unpublished works are thus within the scope of the 1976 Copyright Act, which expressly preempts much of the former common law protection for unpublished works. See Comment e. State law remains free to protect from appropriation only those works that are not within the subject matter of federal copyright law, including works of authorship that have not been fixed in a tangible medium of expression.

It was well established at common law that the public performance of a work did not constitute "publication" and therefore did not divest common law copyright. Thus, while there is little case law, common law copyright might be invoked to prevent the appropriation of unfixed works such as extemporaneous speeches or live musical performances. However, although state common law copyright protection for unfixed works is not preempted by the 1976 Copyright Act, the significance of such protection is diminished by modern recording technologies that facilitate the fixation of works and the consequent acquisition of federal copyright protection. In addition, the appropriation of an unfixed work will often invade interests protected under other principles of law. The appropriation of an idea offered to another through an oral presentation, for example, can be actionable under the law of trade secrets. See § 39, Comment h. Similarly, unfixed performances may occur in circumstances that justify the implication of an obligation of confidentiality or in controlled settings that afford the opportunity to impose physical or contractual restrictions on recording or other reproduction. The unauthorized exploitation of an unfixed performance can also be actionable as an infringement of the right of publicity if it appropriates the commercial value of the performer's identity. See § 47, Comment d. Nevertheless, protection for works of authorship at common law has historically been pursued through the doctrine of common law copyright. Since the federal copyright statute expressly preserves common law protection for unfixed works of authorship, see *17 U.S.C.A. § 301,* the continued recognition of rights in this narrowly-defined subject matter through the doctrine of common law copyright does not present the problems associated with judicial recognition of a more general misappropriation tort. However, comprehensive protection for unfixed works of authorship, which can encompass works extending from formal performances to casual conversations, may require limitations best implemented through legislation. Statutes in many states, for example, prohibit the unauthorized commercial recording

of live performances.

e. Preemption by federal patent and copyright law. Many potential applications of the misappropriation doctrine are preempted by federal patent and copyright law. Beginning with the companion decisions in *Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964),* and *Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964),* the United States Supreme Court has endeavored to define the permissible scope of state statutory and common law restrictions on copying. See § 16, Comment c. Emphasizing that the system of federal patent protection depends "almost entirely on a backdrop of free competition in the exploitation of unpatented designs and innovations," the Supreme Court in *Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 151, 156-57, 109 S.Ct. 971, 977, 980-81, 103 L.Ed.2d 118, 138 (1989),* declared that "[a] state law that substantially interferes with the enjoyment of an unpatented utilitarian or design conception which has been freely disclosed by its author to the public at large impermissibly contravenes" federal patent policy. Thus, states may not apply the misappropriation doctrine to prevent the copying of products or ideas for mechanical or other utilitarian innovations that have been disclosed to the public.

Section 301 of the 1976 Copyright Act, *17 U.S.C.A. § 301,* precludes the recognition under state law of rights "equivalent" to any of the exclusive rights of copyright in works that are "within the subject matter" of the Copyright Act. State rules protecting interests outside the scope of copyright, such as those affording relief against deception, consumer confusion, or breaches of confidence, are not preempted as "equivalent" to copyright. See § 16, Comment c; § 39, Comment c. However, primary among the rights of copyright in § 106, *17 U.S.C.A. § 106,* is the exclusive right of reproduction. Courts have consistently concluded that in most if not all of its applications, the misappropriation doctrine affords a right "equivalent" to copyright. Preemption of state misappropriation law under § 301 thus turns on whether the object of state protection is within the subject matter preempted by the 1976 Copyright Act. Section 301 expressly authorizes state protection for unfixed works, which are ineligible for federal copyright under § 102(a), *17 U.S.C.A. § 102*(b). See Comment d. State restrictions on appropriating the copyrightable aspects of works fixed in a tangible medium of expression, however, are clearly preempted. A more difficult issue arises in connection with the application of the misappropriation doctrine to protect the non-copyrightable aspects or elements of such works, including ideas or facts taken apart from the form in which they are expressed. Some courts and commentators have argued that the exclusion of ideas and facts from copyright protection in § 102(b) of the Copyright Act demonstrates that such material is not "within the subject matter of copyright," thus permitting protection under state law. However, § 102(b) can be seen, not as an exclusion of subject matter, but as a limitation on the scope of protection available to copyrighted works. Many cases therefore conclude that protection under state law for ideas, facts, or other noncopyrightable aspects of compilations and other works within the subject matter of copyright is preempted under § 301. Even if not preempted under a literal interpretation of § 301, state protection of facts and ideas may interfere with the balance between protection and access struck by Congress in the 1976 Copyright Act and may thus be preempted under the supremacy clause. State protection of facts and ideas can also interfere with rights under the first amendment.

Although the preemptive scope of federal patent and copyright law remains uncertain, the potential for interference with the policies underlying the federal intellectual property regime counsels against the recognition of broad and indeterminate rights against misappropriation.

**REPORTERS NOTES:** Comment a. Notwithstanding the Supreme Court's 1918 decision in International News Service v. Associated Press, the Restatement of Torts published in 1939 contained no acknowledgement of the misappropriation doctrine.

Comment b. Many early commentators warned against broad recognition of the misappropriation doctrine. See, e.g., Kocourek, Comment, *13 Ill.L.Rev. 708 (1919);* Handler, Unfair Competition, *21 Iowa L.Rev. 175, 189 (1936)* ("For one to reap with impunity the fruits of another's labor may be reprehensible, but the creation of new species of property interests and new series of monopolies by the courts may be disastrous to free enterprise."); Chafee, Unfair Competition, *53 Harv.L.Rev. 1289 (1940);* Brown, Advertising and the Public Interest: Legal Protection of Trade Symbols, *57 Yale L.J. 1165 (1948).* On the other hand, some commentators applauded the decision. See Rogers, Unfair

Competition, *17 Mich.L.Rev. 490 (1919);* Callmann, He Who Reaps Where He Has Not Sown: Unjust Enrichment in the Law of Unfair Competition, *55 Harv.L.Rev. 595 (1942);* Green, Protection of Trade Relations Under Tort Law, *47 Va.L.Rev. 559 (1961).* More recent commentary on the misappropriation doctrine includes Baird, Common Law Intellectual Property and the Legacy of International News Service v. Associated Press, *50 U.Chi.L.Rev. 411 (1983);* Gordon, On Owning Information: Intellectual Property and the Restitutionary Impulse, *78 Va.L.Rev. 149 (1992);* Rahl, The Right to "Appropriate" Trade Values, *23 Ohio St.L.J. 56 (1962);* Raskind, The Misappropriation Doctrine as a Competitive Norm of Intellectual Property Law, *75 Minn.L.Rev. 875 (1991).*

There is no general common law prohibition against benefiting from the efforts of others. See, e.g., *Emerson v. Davies, 8 F.Cas. 615, 619 (C.C.D.Mass.1845)* ("Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before."); *WCVB-TV v. Boston Athletic Ass'n, 926 F.2d 42, 45 (1st Cir.1991)* ("But the man who clears a swamp, the developer of a neighborhood, the academic scientist, the school teacher, and millions of others, each day create 'value' (over and above what they are paid) that the law permits others to receive without charge."); *National Football League v. Governor of Delaware, 435 F.Supp. 1372, 1378 (D.Del. 1977)* ("It is true that Delaware is thus making profits from the use of the plaintiffs' football scores in a state lottery it would not make but for the existence of the NFL, but I find this difficult to distinguish from the multitude of charter bus companies who generate profit from servicing those of plaintiffs' fans who want to go to the stadium or, indeed, the sidewalk popcorn salesman who services the crowd as it surges towards the gate.").

A number of recent cases expressly acknowledge the balancing of interests inherent in the recognition of exclusive rights in intangible property. See, e.g., *United States Golf Ass'n v. St. Andrews Systems, DataMax, Inc., 749 F.2d 1028, 1035 (3d Cir.1984)* ("The dilemma posed by the doctrine can best be viewed as an attempt to provide the necessary incentives to the creators of intellectual property without unnecessarily restricting the public's free access to information."); *Board of Trade v. Dow Jones & Co., 98 Ill.2d 109, 119, 74 Ill.Dec. 582, 587, 456 N.E.2d 84, 89 (1983)* ("Competing with the policy that protection should be afforded one who expends labor and money to develop products is the concept that freedom to imitate and duplicate is vital to our free market economy."). See also, e.g., *Roho, Inc. v. Marquis, 902 F.2d 356, 360 (5th Cir.1990)* ("Although copyists undoubtedly incur the enmity of the product's creator, they serve the public interest by promoting competition and price reductions."). For arguments that the balancing is best accomplished through legislation, see, e.g., *International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918)* (Brandeis, J., dissenting); *Cheney Bros. v. Doris Silk Corp., 35 F.2d 279 (2d Cir.1929),* cert. denied *281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145 (1930)* (L. Hand, J.); *Board of Trade, supra* (Simon, J., dissenting). See also Handler, supra, 21 Iowa L.Rev. at 189-90 ("Judge-made monopolies find their origin and their regulation in the law of torts and the protection of the public interest is at best unsystematic and fortuitous."); Gordon, supra, 78 Va.L.Rev. at 281 ("Legislatures likely will continue to be the best institutions for implementing protection for intellectual products * * *.").

Comment c. A number of decisions limit the INS case to its facts. See, e.g., *Cheney Bros. v. Doris Silk Corp., 35 F.2d 279, 280 (2d Cir.1929),* cert. denied *281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145 (1930)* (L. Hand, J.) ("We think that no more was covered than situations substantially similar to those then at bar."); *National Comics Pub., Inc. v. Fawcett Pub., Inc., 191 F.2d 594 (2d Cir.1951)* (L. Hand, J.); *Speedry Products, Inc. v. Dri Mark Products, Inc., 271 F.2d 646 (2d Cir.1959)* (the INS case "is sui generis"); *Famolare, Inc. v. Melville Corp., 472 F.Supp. 738 (D.Hawaii 1979),* affirmed *652 F.2d 62 (9th Cir.1981).* Early cases declining to apply the misappropriation rationale include, e.g., *Triangle Pub., Inc. v. New England Newspaper Pub. Co., 46 F.Supp. 198, 203 (D.Mass.1942)* ("It is not unfair competition in Massachusetts to use information assembled by a competitor"); *Clipper Belt Lacer Co. v. Detroit Belt Lacer Co., 223 Mich. 399, 194 N.W. 125 (1923)* (declining to apply INS to the defendant's sale of hooks designed to fit the plaintiff's machines); *Germanow v. Standard Unbreakable Watch Crystals, Inc., 283 N.Y. 1, 27 N.E.2d 212 (1940)* (declining to apply INS to a competitor's appropriation of the plaintiff's measuring system for watch crystals); *New England Tel. & Tel. Co. v. National Merchandising Corp., 335 Mass. 658, 141 N.E.2d 702 (1957)* (refusing to apply the misappropriation doctrine to prevent the defendant's sale of covers for the plaintiff's telephone directories bearing advertising sold by the defendant). But see *National Tel. Directory Co. v. Dawson Mfg. Co., 214 Mo.App. 683, 263 S.W.*

Restatement of the Law, Third, Unfair Competition, § 38

*483 (1924)* (applying INS on similar facts).

The misappropriation doctrine prevailed in several cases on facts similar to INS. See *Associated Press v. KVOS, Inc., 80 F.2d 575 (9th Cir.1935),* reversed for lack of jurisdiction, *299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936)* (appropriation of news by a radio station); *Pottstown Daily News Pub. Co. v. Pottstown Broadcasting Co., 411 Pa. 383, 192 A.2d 657 (1963)* (same); *McCord Co. v. Plotnick, 108 Cal.App.2d 392, 239 P.2d 32 (1951)* (appropriation of news by a competing publication). See also *National Exhibition Co. v. Fass, 143 N.Y.S.2d 767 (Sup.Ct.1955)* and *Twentieth Century Sporting Club, Inc. v. Transradio Press Service, Inc., 165 Misc. 71, 300 N.Y.S. 159 (Sup.Ct.1937),* both enjoining the appropriation of information from radio broadcasts of sporting events for the purpose of recreating the event on other radio stations. But see *Loeb v. Turner, 257 S.W.2d 800 (Tex.Civ.App. 1953),* permitting the defendant's recreated broadcast of a stock car race based on the plaintiff's radio broadcast when the plaintiff and defendant served different cities. Compare *WCVB-TV v. Boston Athletic Ass'n, 926 F.2d 42 (1st Cir.1991),* refusing to enjoin the defendant's unauthorized broadcast of the Boston Marathon, with *Pittsburgh Athletic Co. v. KQV Broadcasting Co., 24 F.Supp. 490 (W.D.Pa.1938),* enjoining the defendant from broadcasting the plaintiff's baseball games from vantage points outside the stadium.

The misappropriation doctrine played a significant role in the early protection of sound recordings. In *Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433, 194 A. 631 (1937),* the doctrine was applied under Pennsylvania law to prevent unauthorized radio broadcasts of the plaintiff's recordings. Judge Learned Hand's opinion in *RCA Mfg. Co. v. Whiteman, 114 F.2d 86* (2d Cir.), cert. denied *311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463 (1940),* denied an injunction on similar facts, holding that the public sale of the recordings divested the plaintiff of common law rights. The 1976 Copyright Act denies an exclusive right of public performance in sound recordings. *17 U.S.C.A. § 114.* See also *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483 (1950),* affirmed *279 A.D. 632, 107 N.Y.S.2d 795 (1951),* which applied the misappropriation doctrine under New York law to enjoin the defendant's sale of unauthorized recordings made from radio broadcasts of the Metropolitan Opera. Under the 1976 Copyright Act, recording of the radio broadcasts by the plaintiff at the time of transmission would invest federal copyright protection. *17 U.S.C.A. § 101* (definition of " fixed"). The misappropriation doctrine was also invoked in a number of cases to prevent the unauthorized duplication and sale of sound recordings by record pirates. See, e.g., *A & M Records, Inc. v. M.V.C. Distributing Corp., 574 F.2d 312 (6th Cir.1978); Capitol Records, Inc. v. Mercury Records Corp., 221 F.2d 657 (2d Cir.1955)* (with a dissent by L. Hand); *United States Sporting Products, Inc. v. Johnny Stewart Game Calls, Inc., 865 S.W.2d 214 (Tex.App. 1993); Capitol Records, Inc. v. Spies, 130 Ill.App.2d 429, 264 N.E.2d 874 (1970); Mercury Record Productions, Inc. v. Economic Consultants, Inc., 64 Wis.2d 163, 218 N.W.2d 705 (1974),* cert. denied *420 U.S. 914, 95 S.Ct. 1107, 43 L.Ed.2d 386 (1975); Gai Audio, Inc. v. Columbia Broadcasting System, Inc., 27 Md.App. 172, 340 A.2d 736 (1975)* (awarding compensatory and punitive damages); *Columbia Broadcasting System, Inc. v. Melody Recordings, Inc., 134 N.J.Super. 368, 341 A.2d 348 (1975).* On February 15, 1972, sound recordings became eligible for protection under federal copyright law, thus preempting state protection. See *17 U.S.C.A. §§ 114,* 301. Protection under state law for pre-1972 recordings is expressly preserved in § 301(c) of the 1976 Copyright Act until the year 2047.

Unauthorized retransmissions of radio and television broadcasts also prompted claims founded on *INS. Compare Mutual Broadcasting System, Inc. v. Muzak Corp., 177 Misc. 489, 30 N.Y.S.2d 419 (1941)* (issuing an injunction against the retransmission of plaintiff's radio broadcast of the 1941 World Series) with *Intermountain Broadcasting & Television Corp. v. Idaho Microwave, Inc., 196 F.Supp. 315 (D.Idaho 1961)* (declining to apply the INS case to cable television retransmission, emphasizing the lack of direct competition). Retransmission by cable and satellite carriers is now subject to a complex system of regulation under the 1976 Copyright Act, *17 U.S.C.A. §§ 111,* 119. Cf. *Orth-O-Vision, Inc. v. Home Box Office, 474 F.Supp. 672 (S.D.N.Y.1979)* (state misappropriation claim directed at the unauthorized retransmission of a copyrighted broadcast is preempted). Unauthorized reception of transmissions is also regulated by the Federal Communications Act, *47 U.S.C.A. § 151* et seq., but misappropriation claims have continued. See *KMLA Broadcasting Corp. v. Twentieth Century Cigarette Vendors Corp., 264 F.Supp. 35 (C.D.Cal.1967)* (injunction issued against a defendant who provided equipment capable of receiving plaintiff's subscription radio

broadcasts); *American Television and Communications Corp. v. Manning, 651 P.2d 440 (Colo.App.1982)* (sale of unauthorized receiving equipment enjoined).

Although the United States Supreme Court has occasionally cited the INS decision, it has never reaffirmed the misappropriation doctrine. See, e.g., *Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)* and *Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)*, both citing INS for the proposition that ideas and facts are not copyrightable. In *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987)*, the Court cited INS in upholding the constitutionality of a federal statute granting the United States Olympic Committee exclusive rights in the commercial use of the word "Olympic." In *Carpenter v. United States, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987)*, INS was invoked to support the conclusion that confidential and unpublished business information was "property" for purposes of the federal wire and mail fraud statutes. Cf. *KVOS, Inc. v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936)* (declining to consider the merits of the INS decision due to the absence of subject matter jurisdiction); *Fashion Originators' Guild, Inc. v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941)* (noting that after *Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)*, the substantive issue in INS is a matter of state law). The dissenting opinion of Justice Brandeis in the INS case is cited in *Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974)* and *Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973)*, for the proposition that ideas in general circulation are part of the public domain.

In many of the decisions that invoke the misappropriation doctrine, relief can be justified on more traditional grounds. See, e.g., *Lexton-Ancira Real Estate Fund, 1972 v. Heller, 826 P.2d 819 (Colo.1992)* (although affirming relief on a misappropriation claim, the court noted that a variety of deceptive practices including trade name infringement contributed to the plaintiff's injury); *Roy Export Co. Establishment v. Columbia Broadcasting System, Inc., 672 F.2d 1095 (2d Cir.)*, cert. denied *459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)* (misappropriation doctrine applied while noting that "such an amorphous cause of action is capable of mischievous application," but also finding infringement of common law copyright); *Dior v. Milton, 9 Misc.2d 425, 155 N.Y.S.2d 443 (Sup.Ct.)*, affirmed *2 A.D.2d 878, 156 N.Y.S.2d 996 (1956)* (misappropriation applied to protect dress designs, but access had been gained through fraud and misrepresentation); *Standard & Poor's Corp. v. Commodity Exchange, Inc., 683 F.2d 704 (2d Cir.1982)* (preliminary injunction issued against the use of plaintiff's stock index in defendant's stock futures contracts, but also finding a likelihood of confusion). Cf. *Wilson v. Electro Marine Systems, Inc., 915 F.2d 1110 (7th Cir.1990)* (declining to apply the misappropriation doctrine in the absence of fraud or breach of confidence).

A number of cases invoke the misappropriation doctrine to protect trademarks and other trade designations. In some decisions the INS case is cited despite proof of a likelihood of confusion that would permit relief under traditional rules of trademark infringement. See, e.g., *Fisher v. Star Co., 231 N.Y. 414, 132 N.E. 133*, cert. denied *257 U.S. 654, 42 S.Ct. 94, 66 L.Ed. 419 (1921)* (plaintiff's cartoon characters were found to have acquired secondary meaning). In other decisions, however, the misappropriation doctrine has been applied to justify protection for the ornamental or merchandising value of a trademark or trade name when there was little apparent likelihood of consumer confusion. See, e.g., *Boston Athletic Association v. Sullivan, 867 F.2d 22 (1st Cir.1989); Warner Bros., Inc. v. Gay Toys, Inc., 658 F.2d 76 (2d Cir.1981); Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774 (2d Cir.1964)*, cert. denied *380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965); Universal City Studios, Inc. v. Kamar Industries, Inc., 217 U.S.P.Q. 1162 (S.D.Tex.1982); Universal City Studios, Inc. v. Montgomery Ward & Co., 207 U.S.P.Q. 852 (N.D.Ill.1980)*. Cf. *Board of Trade v. Dow Jones & Co., 98 Ill.2d 109, 456 N.E.2d 84 (1983)* (an injunction against the unauthorized use of a well-known stock index in stock market futures contracts was issued to prevent an appropriation of the originator's good will). The scope of protection afforded to trade symbols under traditional principles of trademark law, including the requirement of a likelihood of confusion (see, e.g., § 20, Comment e), the right of fair use (§ 28), and the limitations on protection against dilution (see § 25), reflects a sensitive balancing of competing interests that should not be undermined by appeals to a general misappropriation rationale. Many cases refuse to allow the misappropriation doctrine to circumvent traditional limitations on the protection of trade symbols. See, e.g., *WCVB-TV v. Boston Athletic Ass'n, 926 F.2d 42 (1st Cir.1991); Toho Co. v. Sears, Roebuck & Co., 645 F.2d 788 (9th Cir.1981); Diversified*

Restatement of the Law, Third, Unfair Competition, § 38

*Marketing, Inc. v. Estee Lauder, Inc., 705 F.Supp. 128 (S.D.N.Y.1988); Sykes Laboratory, Inc. v. Kalvin, 610 F.Supp. 849 (C.D.Cal.1985); Eastern Air Lines, Inc. v. New York Air Lines, Inc., 559 F.Supp. 1270 (S.D.N.Y.1983).*

When the appropriation by the defendant does not interfere with the plaintiff's exploitation of the asset in its primary market, appeals to the INS case are regularly rejected absent a violation of other protected interests. In *United States Golf Ass'n v. St. Andrews Systems, Data-Max, Inc., 749 F.2d 1028, 1029-30 (3d Cir.1984),* the court refused to enjoin defendant's use of the plaintiff's golf handicapping formula in the defendant's handicapping service. The court, distinguishing the directly-competitive appropriation in INS, noted that "in using the formula defendant will not compete directly with the U.S.G.A., and thus will not interfere with the economic incentive of the U.S.G.A. to maintain and update its handicapping formula." Similarly, in *National Football League v. Governor of Delaware, 435 F.Supp. 1372, 1378 (D.Del.1977),* the court rejected a claim of misappropriation raised by the NFL against the use of football scores in a state lottery, emphasizing that the state was not appropriating the performances from which the NFL derives its profits. Other cases rejecting misappropriation claims when the defendant's use was not in direct competition with the plaintiff include, e.g., *Universal City Studios, Inc. v. Ideal Pub. Corp., 195 U.S.P.Q. 761 (S.D.N.Y.1977)* (denying an injunction against publication of a magazine devoted to the plaintiff's television series); *Intermountain Broadcasting & Television Corp. v. Idaho Microwave, Inc., 196 F.Supp. 315 (D.Idaho 1961)* (retransmission of the plaintiff's television signal to a different market); *Gary Van Zeeland Talent, Inc. v. Sandas, 84 Wis.2d 202, 267 N.W.2d 242 (1978)* (distinguishing collateral assets like customer lists from trade values marketed to customers); *Loeb v. Turner, 257 S.W.2d 800 (Tex.Civ.App.1953)* (recreation of a radio broadcast in a different city). In a few cases revenues from licenses have been treated as part of the plaintiff's primary market. See *Pittsburgh Athletic Co. v. KQV Broadcasting Co., 24 F.Supp. 490 (W.D.Pa.1938)* (unauthorized broadcast of baseball games in competition with the licensed broadcast); *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483 (1950),* affirmed *279 App.Div. 632, 107 N.Y.S.2d 795 (1951)* (sale of unauthorized recordings of radio transmissions in competition with licensed recordings). But in *Board of Trade, supra,* an injunction was issued against the use of a stock index in futures contracts despite the court's conclusion that the use did not threaten the originator's incentives or revenues -- a result specifically rejected in *United States Golf Ass'n, supra.* See also *Standard & Poor's Corp. v. Commodity Exchange, Inc., 683 F.2d 704 (2d Cir.1982)* (holding on facts similar to Board of Trade that the issue presented "sufficiently serious questions" to permit a preliminary injunction). Cf. *Golden Nugget, Inc. v. American Stock Exchange, Inc., 828 F.2d 586 (9th Cir.1987)* (distinguishing INS and Board of Trade and declining to enjoin the trading of options on plaintiff's corporate stock without the plaintiff's consent).

Comment d. The history and current scope of common law copyright are described in Goldstein, Copyright §§ 15.4-15.6; Nimmer on Copyright § 8.23. Common law copyright is preempted under § 301 of the 1976 Copyright Act, *17 U.S.C.A. § 301,* except as applied to works not fixed in any tangible medium of expression or to other works outside the scope of federal copyright. Although common law copyright was limited to unpublished works, the public performance of a work did not constitute "publication" and therefore did not divest common law copyright. *Ferris v. Frohman, 223 U.S. 424, 32 S.Ct. 263, 56 L.Ed. 492 (1912)* (public performance of a play); *Heim v. Universal Pictures Co., 154 F.2d 480 (2d Cir.1946)* (public performance of a song); *Nutt v. National Institute Inc. for Improvement of Memory, 31 F.2d 236 (2d Cir.1929)* (delivery of lectures); *King v. Mister Maestro, Inc., 224 F.Supp. 101 (S.D.N.Y.1963)* (delivery of a speech). Thus, claims for infringement of unfixed works appropriated from a public or private performance may be cognizable at common law. Several cases, however, indicate that common law copyright might not extend to unfixed works. See *Roy Export Co. Establishment Etc. v. Columbia Broadcasting System, Inc., 503 F.Supp. 1137 (S.D.N.Y.1980),* affirmed *672 F.2d 1095 (2d Cir.),* cert. denied *459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); Rowe v. Golden West Television Productions, 184 N.J.Super. 264, 445 A.2d 1165 (1982).* Courts have been reluctant to recognize common law rights in conversations. See *Falwell v. Penthouse Int'l, Ltd., 521 F.Supp. 1204, 1207 (W.D.Va.1981)* ("The existence of common law copyright protection for the spoken word has not been established by any court.") and *Estate of Hemingway v. Random House, Inc., 23 N.Y.2d 341, 296 N.Y.S.2d 771, 244 N.E.2d 250 (1968),* both noting that the facts did not support liability for breach of confidence. Cf. *Sinatra v. Wilson, 2 Media L.Rptr. 2008, 2010 n.2 (S.D.N.Y.1977)* (denying defendant's motion to dismiss, but noting plaintiff's "heavy burden of showing that plaintiff clearly indicated to defendants his wish to exercise control over the publication of these statements"); *Marvin*

Restatement of the Law, Third, Unfair Competition, § 38

*Worth Productions v. Superior Films Corp., 319 F.Supp. 1269 (S.D.N.Y.1970)* (dictum suggesting that conversations can be protectable).

In some cases the doctrine of common law copyright has been applied to idea submissions that are better analyzed under the rules governing trade secrets, confidential relationships, or contracts. See *Silver v. Television City, Inc., 207 Pa.Super. 150, 215 A.2d 335 (1965); Jenkins v. News Syndicate Co., 128 Misc. 284, 219 N.Y.S. 196 (Sup.Ct.1926).* In other cases, common law copyright in unfixed works may overlap with the protection available to a performer under the right of publicity. See *Zacchini v. Scripps-Howard Broadcasting Co., 47 Ohio St.2d 224, 351 N.E.2d 454 (1976),* reversed *433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977)* (relief against the appropriation of plaintiff's live performance was granted by the Ohio Court of Appeals on grounds of common law copyright; the Ohio Supreme Court and the United States Supreme Court treated plaintiff's claim as one for infringement of the right of publicity); *Columbia Broadcasting System, Inc. v. Documentaries Unlimited, Inc., 42 Misc.2d 723 and 726, 248 N.Y.S.2d 809 (Sup.Ct.1964)* (common law copyright recognized in a broadcaster's news announcement of the assassination of President Kennedy, acknowledging the appropriated "voice and style" as aspects of the broadcaster's personality). See § 47, Comment d.

California has a statute of general application that recognizes rights in the "representation or expression" of original works of authorship not fixed in any tangible medium of expression. Cal.Civ.Code § 980. Many states have enacted more limited statutes prohibiting the unauthorized commercial recording of live performances or transmissions. See Copyright Law Reporter (CCH) P 10,901.

Comment e. The Supreme Court's opinion in Bonito Boats distinguished the Court's earlier decision in *Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974),* which held that state trade secret law is not preempted. The Court noted that unlike the protection of trade secrets, the prohibition against duplication by molding in Bonito Boats effectively withdrew subject matter from the public domain. See § 39, Comment c. That the misappropriation doctrine cannot be used to prevent product copying, see, e.g., *Famolare, Inc. v. Melville Corp., 472 F.Supp. 738 (D.Hawaii 1979),* affirmed *652 F.2d 62 (9th Cir. 1981)* (shoe design).

Cases holding that misappropriation claims directed at works protectable under federal copyright law are preempted include, e.g., *Warner Bros., Inc. v. American Broadcasting Cos., 720 F.2d 231 (2d Cir.1983)* (cartoon character); *Universal City Studios, Inc. v. T-Shirt Gallery, Ltd., 634 F.Supp. 1468 (S.D.N.Y.1986)* (elements of a television series); *Mayer v. Josiah Wedgwood & Sons, Ltd., 601 F.Supp. 1523 (S.D.N.Y.1985)* (graphic design); *Schuchart & Associates, Professional Engineers, Inc. v. Solo Serve Corp., 540 F.Supp. 928 (W.D.Tex.1982)* (architectural drawings); *Giangrasso v. CBS, Inc., 534 F.Supp. 472 (E.D.N.Y.1982)* (radio script). Section 301(c) of the Copyright Act specifically exempts from preemption state protection of sound recordings fixed prior to February 15, 1972, the date on which sound recordings were added to the subject matter of federal copyright law. See *Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973),* holding that the preemptive effect of the 1909 Copyright Act did not extend to subject matter left "unattended" by federal law. Statutes in many states remain in effect to protect pre-1972 sound recordings. See Copyright Law Reporter (CCH) P 10,901.

The House Judiciary Committee Report accompanying the 1976 Copyright Act, in a discussion of the International News Service case, expressed the view that a cause of action for misappropriation may not be equivalent to copyright, emphasizing the "consistent pattern" of appropriation against which relief was granted in INS. H.R.Rep.No. 94-1476, 94th Cong., 2d Sess. 132 (1976). However, at the time the House Report was prepared, § 301 of the copyright revision bill specifically preserved "rights against misappropriation not equivalent to" copyright. The reference to misappropriation was deleted prior to enactment. In a few of the cases holding misappropriation claims preempted, the courts have distinguished the discussion in the House Report on the basis of the quantity and systematic nature of the appropriation involved in INS. See *Financial Information, Inc. v. Moody's Investors Service, Inc., 808 F.2d 204 (2d Cir.1986),* cert. denied *484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987); Nash v. CBS, Inc., 704 F.Supp. 823 (N.D.Ill.1989),* affirmed *899 F.2d 1537 (7th Cir.1990).*

Restatement of the Law, Third, Unfair Competition, § 38

Language in a few cases suggests that since facts and ideas cannot be protected under copyright, they remain eligible for protection under state law. See *Mayer, supra* (dictum); *Rand McNally & Co. v. Fleet Management Systems, Inc., 591 F.Supp. 726 (N.D.Ill.1983)* (dictum); *Bromhall v. Rorvik, 478 F.Supp. 361 (E.D.Pa.1979)*. See also Goldstein, Copyright § 15.2.3; Nimmer on Copyright § 101B2. Most cases, however, hold that recognition under state law of a right to prevent the appropriation of facts, research, or ideas from a work fixed in a tangible medium of expression is preempted under § 301. See, e.g., *Financial Information, supra; Ehat v. Tanner, 780 F.2d 876 (10th Cir.1985),* cert. denied *479 U.S. 820, 107 S.Ct. 86, 93 L.Ed.2d 39 (1986); Harper & Row Pub., Inc. v. Nation Enterprises, 723 F.2d 195 (2d Cir.1983),* reversed on other grounds *471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); Nash, supra, 704 F.Supp. at 832* ("If the rule were otherwise, states would be free to regulate materials Congress has assigned to the public domain."); *Gem Products, Inc. v. Robertshaw Controls Co., 229 U.S.P.Q. 740 (C.D.Cal.1986); Mitchell v. Penton/Industrial Pub. Co., 486 F.Supp. 22 (N.D.Ohio 1979); Garrido v. Burger King Corp., 558 So.2d 79 (Fla.App.1990).* See also Abrams, Copyright, Misappropriation, and Preemption: Constitutional and Statutory Limits of State Law Protection, *1983 Sup.Ct.Rev. 509 (1983).*

State protection that interferes with the balance struck by federal copyright law is presumably subject to preemption even if not specifically prohibited under § 301. In a number of cases decided under the prior copyright act, the courts concluded that state protection for facts or ideas was void under the supremacy clause. See, e.g., *Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 980* (2d Cir.), cert. denied *449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980)* ("Where, as here, historical facts, themes, and research have been deliberately exempted from the scope of copyright protection to vindicate the overriding goal of encouraging contributions to recorded knowledge, the states are pre-empted from removing such material from the public domain."); *Synercom Technology, Inc. v. University Computing Co., 474 F.Supp. 37 (N.D.Tex.1979); H.W. Wilson Co. v. National Library Service Co., 402 F.Supp. 456 (S.D.N.Y.1975).* That the preemptive effect of federal copyright law extends beyond the literal scope of § 301, see, e.g., Goldstein, Copyright § 15.3; Abrams, supra;Ginsburg, No "Sweat"? Copyright and Other Protection of Works of Information after Feist v. Rural Telephone, *92 Colum.L.Rev. 338 (1992).*

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Copyright LawCivil Infringement ActionsGeneral OverviewInternational Trade LawTrade AgreementsIntellectual Property ProvisionsTrade Secrets LawFederal & State RegulationGeneral Overview